

## NUMBERS
## 13-10-00427-CR
## 13-10-00428-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

DON STONE,                                                                          Appellant,

v.

THE STATE OF TEXAS,                                                                  Appellee.

### On appeal from the 130th District Court
### of Matagorda County, Texas.

### MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Chief Justice Valdez

Appellant, Don Stone, was convicted of one count of aggravated sexual assault

of a child, one count of indecency with a child by contact, and one count of indecency

with a child by exposure.[1]  *See* TEX. PENAL CODE ANN. §§ 21.11(a)(1), (a)(2)(A), 22.021(a)(1)(B)(i) (West Supp. 2010).  Stone was sentenced to three life sentences to run concurrently.  By four issues, Stone contends that the evidence is legally insufficient to support his conviction and that the convictions for indecency with a child violate the constitutional prohibition against double jeopardy.  *See* U.S. CONST. amend V.  We affirm the judgment in appellate cause number 13-10-00427-CR, and we modify the judgment in appellate cause number 13-10-00428-CR and affirm as modified.

## I.  BACKGROUND

Stone lived in Bay City, Texas with his common law wife, A.P., who had a daughter, T.P. and a granddaughter, T.S.  A.P. and Stone sometimes cared for T.S. and T.S.'s brother, "Papa."[2]  In February 2009, T.P. went to visit friends in Las Vegas, Nevada, and she left T.S. with Stone and A.P.[3]  After returning from Las Vegas, T.P. moved to Houston, Texas sometime at the end of February or beginning of March; however, she left T.S. with Stone and A.P. because T.P. wanted T.S. to finish out the school year in Bay City.  T.P. took Papa with her to Houston.  T.S. moved to Houston to live wither her mother, T.P., at the end of May.

---

[1] In appellate cause number 13-10-00427-CR, Stone was convicted of two counts of indecency with a child; in appellate cause number 13-10-00428-CR, he was convicted of one count of aggravated sexual assault of a child.

[2] We have used aliases to protect the identity of the children.

[3] T.P. stated that when she took her trip to Las Vegas, T.S. "was very upset every time [she] talked to her.  She was crying" and she was begging T.P. to return home.  T.S. did not tell T.P. what was wrong.  When T.P. was in Las Vegas, A.P. had surgery and apparently left T.S. and Papa alone with Stone.  T.P. believed that A.P. was in the hospital for about two days.  T.P. stated that once A.P. returned home, T.S. "wouldn't be as upset."  T.P. described T.S. as being extremely "clingy" when she returned from Las Vegas.

While living in Houston, T.P. caught T.S. viewing a "cartoon" on her computer of people engaged in sexual activity.[4]  T.P. testified that she told T.S. to go to bed and that they would discuss the cartoon in the morning.  T.P. stated that the next morning, she told T.S. that she was not supposed to watch those types of cartoons on the computer and asked T.S. why she was watching it.  T.S. replied that she did not know why.  T.P. then told T.S. that the computer would be taken out of T.S.'s room and that next time, she would "whoop" T.S.  According to T.P., she gave T.S. a hug, and T.S. started crying.  T.P. stated that she asked T.S. why she was crying and that T.S "just looked down at the ground."  T.P. testified that she went about her business, and T.S. then told her, "Mama, you know that nasty you caught me watching? . . . [Stone] watches that."  T.P. asked T.S. how she knew that Stone had pornographic movies, but T.S. would not answer and "just looked down at the ground."

T.P. called her sister, Tasha, and asked her to talk to T.S.  T.P. did not hear what Tasha said to T.S.  T.P. then had another conversation with T.S.; however, T.P. asked questions "[o]ver a period of days."  According to T.P., T.S. told her that Stone "put his hand inside of her.  Then she said that he would take his thingy and put it in his hand and put it inside of her."[5]  T.P. elaborated that:

> When it first—when I asked her about when they were staying at [A.P.'s], because when—not [A.P.'s], but [A.P.] was staying at 2314 Avenue A because she moved in pretty much right after I left and went to Houston.  And [T.S.] said that that's when she—when he would come, you know and pretty much that that's when he put his hand inside of her.  And she said it hurt and that she had to go to the bathroom and she was bleeding.  And this was like recent—more recent because this is after

---

[4] On cross-examination, T.P. clarified that the cartoon characters "look like real people" and that it is "anime, which is cartoon porn."

[5] On cross-examination, T.P. explained that she had not taught T.S. the proper terms for the body parts and that T.S. called the penis "a thingy."

3

[A.P.] moved from the other location by the old [high] school. You know she was staying there before she moved to [Avenue A].

T.P. continued:

> At that location [Avenue A] she said he just had used his hand pretty much and that that's when he would get her out of bed and lay her on the couch with him to watch the porno.

> When they were staying at the other location [by the old high school], that's when she said he actually took his thingy and, you know, put it inside of her. But he didn't—he had it in his hand she said, and he put it inside of her that way.

T.P. claimed that T.S. said that Stone threatened that if T.S. ever told anyone what he was doing to T.S., he would hurt T.P. and A.P.

T.P. called the police in Houston to report what T.S. had said. However, because the events allegedly occurred in Bay City, T.P. filed a police report there. T.P. then took T.S. to the children's assessment center where she was examined by a doctor. T.S. stated that T.P. told the doctor what Stone had allegedly done to her.

On redirect examination, T.P. testified that T.S. said that Stone would watch pornographic movies with T.S. According to T.P., T.S. said "that when [T.P. was living in Houston, T.S.] would be in the bed with [Papa] sleeping, [and Stone] would come get her out of the bed and come lay her on the couch and have her watch the [pornographic] movies with him" in the living room at the Avenue A residence. When asked if T.S. ever mentioned anything about semen, T.P. acknowledged that T.S. did not know that term but had "said the clear stuff that comes out. And [T.S.] said that it tastes salty." T.P. testified that T.S. told her that the "clear stuff" came out of Stone's "thingy when they were at the residence by the old high school."

T.S., an eight-year-old child, testified that when she was at A.P.'s house, Stone "was trying to do nasty stuff with [her]. He was trying to do stuff that parents do." T.S. said that Stone would call her to the living room or to A.P.'s room and "[h]e was trying to get his thing and try[ing] to put it in [hers]." T.S. said that Stone attempted to remove her clothes, but that she would not let him do so. According to T.S., Stone asked her to take off her clothes, he would take off his clothes, and she would lie on her back in the bed. T.S. stated that when she was with Stone in A.P.'s room, he would not remove his shirt and only removed his pants. T.S. testified that Stone would then "try to get his private and try and to put it on my back. . . . No, on my—my bottom." T.S. later clarified that Stone "would try to get his private" in her "private." T.S. stated that Stone "tried" to put his private in her private "a lot" in the living room and in A.P.'s bedroom. When asked what she saw, T.S. replied, "Got his private and trying to put it inside of it." T.S. explained that when Stone did this to her, it "[h]urt bad" and that Stone was between her legs. T.S. also stated that Stone "was trying to put [his private] in [her] mouth" and that "that clear stuff" came out of his private. T.S. remembered that on one occasion, "that clear stuff" "squirted in [her] mouth" and she tried to spit it out. T.S. explained that "that clear stuff" tasted "nasty." T.S. testified that she "tried" to tell Stone to stop because she knew that he "was trying to do something that was bad. . . ."

The State asked, "[W]hen he would put his private in your private, it would hurt," T.S. replied, "Yes" and stated that she would tell Stone that it hurt but that he would not stop. T.S. testified that Stone also tried to put his hand in her private. T.S. explained that this happened when she was six and then also when she turned seven. She said, when I turned seven, "he's still doing it." When asked if he ever put anything else

5

besides his hand or private into her private, T.S. said, "Yes. His mouth." T.S. explained that Stone was "trying to lick [her private] . . . ." and she would tell him to stop but he would not stop. T.S. testified that sometimes after Stone "was trying" to put his private in her private, her private would hurt and that she saw blood when she went to urinate. The State asked if these "things happened all the time," and T.S. replied, "Yes." T.S. claimed that Stone told her that if she told anyone what he was doing, "[h]e would do something bad to [her]."

According to T.S., Stone committed these acts while T.P. was in Las Vegas and also when T.P. was in Houston with Papa. When asked how often it happened when T.P. was in Houston, T.S. replied, "Like, a lot of times." T.S. also claimed that Stone had sexually abused her when he visited her in Houston after she turned eight.

Marcella Donaruma, M.D., testified that she examined T.S. after T.S. made an outcry. Dr. Donaruma stated that T.S. had dysuria, or the medical term for "it hurts when I pee" and vaginal discharge. Dr. Donaruma clarified that although T.S. had discharge, she did not have any sexually transmitted diseases. After acquiring T.S.'s past medical history from T.P., T.P. left the examination room, and Dr. Donaruma interviewed T.S. alone. Dr. Donaruma testified that she asked T.S. if she had been touched "in a way that a kid should not be touched on your private places," and T.S. replied, "Someone touched me everywhere in my private places." When Dr. Donaruma asked what places, T.S. said, "My behinney, my stomach, and his name is [Stone]." Dr. Donaruma stated that she asked T.S., "What did he touch your places with," and that T.S. said, "His hand and his thingy." According to Dr. Donaruma, T.S. described Stone's thingy as being "short" and having "a straight line in the middle and the clear

6

stuff would come out." T.S. clarified that the "clear stuff" came out of Stone's "thingy." Dr. Donaruma testified that T.S. said, "He put his thingy in me, and it really hurts" and "Where I pee, there is blood coming out." T.S. told Dr. Donaruma that she saw blood "when she was gonna flush the toilet" and then pointed to her private area and said, "My thingy hurts." Dr. Donaruma stated that she asked T.S. how many times Stone touched her thingy with his thingy and that T.S. responded, "A lot." T.S. allegedly told Dr. Donaruma that Stone asked T.S. to touch him and that after she touched him, she washed her hands. T.S. said that Stone showed her "nasty movies . . . where people are naked." Dr. Donaruma ended the interview at this point.

Dr. Donaruma testified that there is a difference in the description of events between a child who has merely viewed pornography and a child who has been sexually abused. Dr. Donaruma stated:

> Well, a child who's describing pornography does not typically throw in the additional detail saying I can feel what it feels like and then not only describing that it does hurt but also when it hurts and then describing that there's blood and then not only that there was blood but when she noticed it. That's the type of really rich detail that adds a lot of credence to her disclosure. . . . And when she went to flush the toilet, there was the blood and her thingy was hurting then. So, she's relating that pain to the bleeding to what happened. It's multiple levels of association that make this a very detailed disclosure.

Dr. Donaruma testified that she believed that T.S.'s description of the events was credible. Dr. Donaruma explained that "it was clear" what T.S. meant by "his thingy," and Dr. Donaruma interpreted the contact as penile/vaginal contact because T.S. pointed to where her "thingy was."

Dr. Donaruma then conducted a physical examination of T.S.'s genital area. Dr. Donaruma testified that T.S.'s hymen "looked great" and that "[e]verything was there

7

that should be there." Dr. Donaruma noted that there was vaginal discharge "pooling" in the vagina and some skin irritation. Dr. Donaruma explained that the irritation probably occurred due to the vaginal discharge; she said, "When you put discharge on skin and then put underpants on top of that, it's very irritating to the skin." Dr. Donaruma stated that the irritation was not indicative of sexual abuse and was more likely related to the discharge and a urinary tract infection. At the end of the examination, Dr. Donaruma informed T.S. that she could not "tell by looking that anything happened" and that meant T.S.'s "body was healthy." Dr. Donaruma, however, did recommend that T.S. receive sexual abuse counseling.

Later, Dr. Donaruma explained that she had examined a fifteen-year-old girl who had just had a seven-pound baby, and she could not "tell by looking at her she ever had sex[,] let alone delivered a baby." She further stated that it was not true that one would expect to find medical evidence that a child has been sexually assaulted. When asked if the physical exam led Dr. Donaruma to the conclusion that T.S. had been sexually abused, she stated:

> That's a hard question to answer. . . . Well, what we know now that this specialty has existed between 20 and 30 years, depending on when you decide to choose the best paper, is that more than 90 percent of children and in some cases even up to 95 percent of children even before and after puberty have no signs of penetration when they describe what we would perceive as penetrating events. So, what we know is that it's normal to have a normal body even after something has happened to you. More importantly, I think is that the body down there is so rapidly healing. It's like the skin inside your mouth.
>
> On Super Bowl Sunday, if you cut your mouth on a nacho, by Tuesday or Wednesday you're not going to have that cut in your mouth anymore. That's the same skin that's in the vagina. It heals very quickly. So, it's unlikely for us to find injury in both cases. So, we just try to do the best we can to make sure we're not missing that 5 to 10 percent of kids who are going to have anything to see.

8

Dr. Donaruma also opined that she did not believe that ninety to ninety-five percent of children were lying when they claimed sexual abuse. She stated that based upon studies:

> The younger children—in general it's very rare for a child to make this up and to continue to make it up to multiple audiences with additional interventions happening after they make these disclosures. Younger children are even less likely to be fabricating things. Above the age of 12 and 13, it's more likely. But what is more likely is for minimization to happen rather than exaggeration. And even then it's still less than 20 percent of cases. The numbers are running away from me. I think it 13 to 15 percent of cases are fabricated or not related in the way to the perpetrator confessing that they happened.

On cross-examination, Dr. Donaruma testified that she did not tell T.P. that her physical exam of T.S. "showed sexual abuse."[6] Dr. Donaruma stated that she "would have said I just don't know yet." Dr. Donaruma explained that when she finds trauma in the hymen, "most often that's in acute assault, so a freshly assaulted body . . . . When things are more remote in time, unless there's a piece of tissue missing, it's very rare to find anything." Dr. Donaruma agreed that children who have not been sexually abused can suffer from urinary tract infections and that "having a urinary tract infection or some type of vaginal infection is not conclusive that there has been sexual abuse." According to Dr. Donaruma, "the best evidence that sexual abuse has occurred is a clear and consistent disclosure from the child."

On redirect examination, Dr. Donaruma stated that she found the physical exam to be indeterminate of sexual abuse but that T.S. was able to give a clear and consistent description of what happened. When asked why Dr. Donaruma concluded

---

[6] T.P. had previously testified that Dr. Donaruma told her that the physical exam showed signs that T.S.'s vagina had been penetrated.

9

that the examination was indeterminate of sexual abuse, despite T.S.'s clear and consistent description of events, Dr. Donaruma replied:

> That's a flaw in the paperwork. So, I often just—right away I just type in stuff that I want to express in situations such as these. If you see our chart, it's boxes. And I check 13 pages of boxes. And, so, what we do is we can check normal exam which means that the body is normal, normal variance, findings caused by medical condition indeterminate, which I checked, and findings of diagnostic of trauma or sexual contact. None of these speak to the content of the interview. It's a box checking flaw we have here.
>
> And, so, what I typically will write, which I didn't have the, I guess, foresight to do here because I didn't know what to make of the discharge was that even with a normal exam, which is what we most often see, I'm not saying I think abuse never happened. I don't describe myself as a lie detector or not. But what I say is that there's nothing acute or chronic on the anatomy of her exam. That does not mean that she is not telling me the truth. And what I would say is that I don't expect to see any residual to the contact she described on her exam based on what she told me, and there's no box to check that explains I'm actually integrating the interview with the physical exam.

When asked if T.P. could have had the impression that the exam showed that T.S. had been sexually abused, Dr. Donaruma said:

> What I say to parents is her body looks totally normal. That doesn't mean I think—that doesn't mean I don't believe anything happened. But there's nothing left—what I would say is there's nothing left behind from what she's telling, but that's good news for her. So, I don't say, oh, it's normal. This is all made up. I just say we're lucky her body is healthy and normal.
>
> . . . .
>
> So, I'm sure [T.P.] heard that because I do believe [T.S.'s] disclosure.

A.P. testified for the defense. A.P. stated that T.P., T.S., and Papa have lived with her at various times. According to A.P., she and Stone lived at 12th Street and then moved to Avenue A, A.P.'s parent's home. A.P. testified that T.P. lived with her

10

approximately for one month before going to Las Vegas and that T.P. went to Las Vegas in January 2009. According to A.P., she and Stone lived at the home on 12th Street when T.P. went to Las Vegas. The home on 12th Street was located "across the street from the old high school."

A.P. stated that she did not witness anything that would cause her to believe T.S.'s allegations. A.P. did not believe the allegations against Stone because she had been with Stone for ten years and "he's never had a charge like this on him before." However, when asked if she thought T.S. was lying, A.P. stated, "I don't believe—well, I'm going to put it this way: Some of it I don't believe—some of it I don't believe she's lying about, and some of it I do believe she's lying about." When asked to clarify, A.P. replied:

> Well, my granddaughter's, she's a very good little girl; and I know I've spoiled 'em both a lot. I have. Because everything they usually ask for I try to get it for 'em, for both of 'em. But—and I've never ever see [Stone] mess with her, with my granddaughter, never. He spent time with 'em, play with 'em. They'll come in and say, [Stone], come in and play with us. And he'll go in there and play with them.

A.P. testified that she did not have any pornography in her home and that she did not allow Stone to bring any into the home. A.P. did not witness Stone watching pornographic movies alone or with the children present and she did not notice Stone missing from the bed at night. According to A.P., Stone treated the grandchildren "very well," and he "would take time, you know, make sure that they had food to eat or cook for them."

On cross-examination, the State asked, "Ma'am, so, you didn't really answer [defense counsel's] question when you said some of it you believe and some of it you don't believe. So, I'm interested in what it is about the allegations you believe?" A.P.

11

responded that she believed T.S. "to a certain extent on some things she told" A.P. The State asked A.P. to repeat those things and A.P. replied, "Well, I'm just—I'm going to tell it like it is because, okay, at first when [T.S.]—[T.P.] told me about what happened—because she called me and when she told me about what had happened, I did believe [T.S.]." A.P. then stated, "But everything has been changing. You know, things—the story's been changed three times." A.P. refused to repeat the "things" that T.S. said Stone had done to her because it was "very bad." A.P. acknowledged that she believed T.S. "at one point."

A.P. testified that when the police were unable to find Stone in order to interview him regarding T.S.'s allegations, Stone was in California. A.P. stated that a police detective yelled at her because he claimed she would not disclose Stone's location, but A.P. insisted that she did tell the detective that Stone was in California. However, A.P. said that she did not have any information about Stone's location in California; and therefore, she was unable to provide that information to the detective. Instead, A.P. told the detective that Stone would call him. Later, A.P. stated that she called Stone and told him that he needed to come home due to the investigation. When asked if she gave the detective Stone's phone number, A.P. replied, "No, because I didn't have the number because he called me."

After hearing the evidence, the jury found Stone guilty of all three counts and sentenced him to three life sentences to run concurrently. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

12

By his first, second, and third issues, Stone contends that the evidence is legally insufficient to support the verdict.[7]  Specifically, Stone argues that the evidence is legally insufficient to support the aggravated assault conviction because:  (1) the State failed to prove the date that the offenses allegedly occurred; (2) T.S.'s testimony was too general; (3) there was no evidence that "anything happened" because T.S. "always used the words 'tried' or 'trying'"; (4) there was no physical evidence; and (5) "T.S. did not describe any identifying marks or the sexual organ of [Stone]."  As to both counts of indecency with a child, Stone argues that the evidence is insufficient to show that he had the intent to gratify "anyone's sexual desire."  As to the second count of indecency with a child by exposure, Stone argues that the evidence is insufficient because this count is a lesser-included offense of aggravated sexual assault.

A.    Standard of Review and Applicable Law

The court of criminal appeals has held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt."  *Brooks v. State*, 323 S.W.3d 893, 902-03, 912 (Tex. Crim. App. 2010) (plurality op.).  Accordingly, we review Stone's claims of evidentiary sufficiency under "a rigorous and proper application" of the *Jackson* standard of review.  *Id.* at 906-

---

[7] Stone also generally asserts that the evidence is factually insufficient to support his conviction; however, as Stone acknowledges, the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense."  *See Brooks v. State*, 323 S.W.3d 893, 902-03, 912 (Tex. Crim. App. 2010) (plurality op.). Therefore, we will not address Stone's general assertions that the evidence is factually insufficient to support the verdict.  *See id.*

07, 912. Moreover, we do not refer separately to legal or factual sufficiency and will only analyze Stone's issues under the *Jackson* standard. *See id.* at 985 (concluding that there is no meaningful distinction between a legal and factual sufficiency analysis).

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 323 S.W.3d at 898-99 (explaining that in the *Jackson* standard we consider "all of the evidence in the light most favorable to the verdict," and determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt). "[T]he fact[-]finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in original); *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979) ("The jury, in all cases is the exclusive judge of facts proved and the weight to be given to the testimony . . . ."); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence.").

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A person commits the offense of aggravated sexual assault of a child by intentionally or knowingly causing the penetration of the sexual

14

organ of a child by any means, and the child was younger than fourteen years of age. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i).  A person commits the offense of indecency with a child if, with a child younger than 17 years of age, the person "engages in sexual contact with the child or causes the child to engage in sexual contact" or the person acts "with intent to arouse or gratify the sexual desire of any person" and that person exposes the anus or any part of the person's genitals knowing the child is present.  *See id.* § 21.11 (a)(1), (2)(A).

## B.    Analysis

### 1.    Aggravated Sexual Assault

By his first issue, Stone contends that there was no evidence that "anything happened" because T.S. used the term "tried" during her testimony.  At trial, T.P. testified that T.S. told her that Stone put his hand inside of her, he put his "thingy" in his hand and then put it inside her, and that T.S. saw "clear stuff" come out of Stone's thingy.  T.P. explained that T.S. said that Stone put his hand inside her when T.S. lived with Stone and A.P. at the residence on Avenue A.  T.P. also claimed that T.S. told her that when she stayed at the residence by the old high school with Stone and A.P., Stone "actually took his thingy and, you know, put it inside her"; T.S. allegedly also saw the "clear stuff" come out of Stone's thingy.

T.S. testified that Stone "was trying to get his thingy and try[ing] to put it in [her thingy]."  T.S. stated that Stone would take off his pants and ask her to remove her clothes.  T.S. claimed that Stone tried to get his private into her private "a lot" while they were in the living room and in A.P.'s bedroom.  T.S. said that she saw Stone attempt to get his private inside her.  T.S. testified that Stone also tried to put his private in her

mouth and that on one occasion, she tasted the "clear stuff" that came out of his "thingy."

Although T.S. used the term "tried" when explaining what Stone had allegedly done to her, she also explained that it hurt, Stone was between her legs, and that she was bleeding after the incident. Furthermore, T.P. testified that T.S. told her that Stone had actually put his "thingy" inside her. Dr. Donaruma also testified that T.S. told her that Stone put his "thingy" in her, that it really hurt, and that she saw blood in the toilet after the incident. From this evidence the jury may have found that Stone penetrated T.S.'s vagina with his penis. *See Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007) (providing that juries are permitted to make reasonable inferences from the evidence); *Jones v. State*, 900 S.W.2d 392, 399 (Tex. App.—San Antonio 1995, writ ref'd) (explaining that the jury may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence). Therefore, viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Stone penetrated T.S.'s sexual organ with his penis. *See Jackson*, 443 U.S. at 319; *see Brooks*, 323 S.W.3d at 898-99. We overrule Stone's first issue complaining of T.S.'s use of the term "tried."

### 2. Date of the Offenses

By his first, second, and third issues, Stone asserts that the State failed to prove the date of the offenses.[8] However, T.P. clarified that T.S. claimed that Stone put his

---

[8] Stone includes this assertion in his first issue contending that the evidence is insufficient to prove that he committed aggravated sexual assault of T.S. However, because he states in his second and third issues that he "incorporates his argument regarding legal and factual sufficiency of the evidence from" his first issue, we will construe this assertion as applying to all of his sufficiency complaints.

16

hand in T.S.'s vagina when they lived at the residence on Avenue A and that he put his penis inside T.S. when they lived at the residence by the old high school. A.P. stated that they lived at the residence by the old high school when T.P. went to Las Vegas. T.P. testified that she went to Las Vegas at the beginning of February 2009. According to T.P., A.P. and Stone moved to the residence on Avenue A at about the same time that T.P. moved to Houston and that she moved to Houston in the middle of February or at the end of March. T.S. moved to Houston with T.P. in May 2009. From this evidence the jury could have concluded that Stone committed the sexual assaults on T.S. during the period T.P. visited friends in Las Vegas and during the period T.P. lived in Houston.

Regardless, the State was not required to prove the exact date of the offenses. *Dixon v. State*, 201 S.W.3d 731, 736 (Tex. Crim. App. 2006) ("'[T]ime is not [usually] a material element of an offense,' and in some cases 'it may be impossible for the State to know precisely, or even approximately, when the charged offense occurred.' Especially where young children are involved, we have cautioned that courts cannot impose unrealistic expectations regarding proof of when an offense actually occurred: '[I]t is not often that a child knows, even within a few days, the date that she was sexually assaulted.'"); *Garcia v. State*, 981 S.W.2d 683, 685-86 (Tex. Crim. App. 1998). "It is well settled that the 'on or about' language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitation period." *Sledge v. State*, 953 S.W.2d 253, 255-256 (Tex. Crim. App. 1997). Here, the indictment alleged that the acts occurred "on or about" February 15, 2009, and the presentment of the indictment occurred on January 13, 2010; therefore, the acts, allegedly occurring in

17

February or March through May 2009 occurred anterior to the presentment of the indictment. *See id.* Accordingly, we overrule Stone's first, second, and third issues as they relate to his claim that the State did not prove the date of the offenses. *See Garcia*, 981 S.W.2d at 685-86.

### 3. Indecency with a Child by Contact

By his second issue, Stone appears to first argue that the evidence showed that the touching of T.S.'s genitals occurred at the same time that the penetration occurred and that the State only alleged one occurrence of sexual abuse in the indictment; therefore, Stone claims the evidence was insufficient to prove the two counts of indecency with a child. However, T.S. and T.P. testified that there was more than one occurrence of sexual abuse. The first event occurred at the residence by the old high school, wherein Stone allegedly put his penis inside T.S.'s vagina. The second event occurred when Stone allegedly put his hand inside T.S.'s vagina when they lived at the residence on Avenue A. T.S. also described a third event wherein Stone asked her to put his penis in her mouth and semen apparently went into T.S.'s mouth. T.S. claimed that Stone "tried" to put his private in her private "a lot" in the living room and in A.P.'s bedroom. Finally, T.S. stated that the sexual abuse occurred "a lot" and claimed that Stone "tried" to "lick" her private on another occasion.

Next, Stone generally contends that there was no evidence that he intended to "gratify anyone's sexual desires." The specific intent required for the offense of indecency with a child may be inferred from a defendant's conduct, his remarks, and all of the surrounding circumstances. *Sendejo v. State*, 26 S.W.3d 676, 678 (Tex. App.—Corpus Christi 2000, pet. ref'd) (citing *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex.

18

Crim. App. 1981)). "An oral expression of intent is not required. The conduct alone is sufficient to infer intent." *Id.* (internal citation omitted).

T.S. testified that she was alone with Stone when he allegedly put his hand in her vagina. T.S. was able to describe Stone's penis to Dr. Donaruma, and she stated that she saw the "clear stuff" come out of Stone's penis. T.S. claimed that Stone threatened to hurt her if she ever told anyone what he was doing. T.S. stated that Stone was "trying to do nasty stuff with [her]." From the circumstances as described by T.S., the jury could have inferred that Stone had the intent to arouse or gratify his sexual desire when he touched T.S.'s vagina with his hand and exposed his penis to T.S.

Therefore, viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Stone had the specific intent to commit the offenses of indecency with a child. *See Jackson*, 443 U.S. at 319; *see Brooks*, 323 S.W.3d at 898-99. We overrule Stone's second and third issues regarding the intent element of indecency with a child.

### III. LESSER-INCLUDED OFFENSE AND DOUBLE JEOPARDY VIOLATION

By a sub-issue to his second issue, in one sentence, Stone asserts that the indecency with a child charges were lesser-included offenses of the aggravated sexual assault charge. By his third issue, Stone asks this Court to reverse the trial court's judgment on the second count of indecency with a child and enter a judgment of acquittal on that count because that count is a lesser-included offense of aggravated sexual assault. By his fourth issue, Stone contends that his double jeopardy rights were violated because the two counts of indecency with child are lesser-included offenses of

19

aggravated sexual assault and all three convictions arose from the same criminal episode.[9] We will address these issues together.

"A person who commits more than one discrete sexual assault against the same complainant may be convicted and punished for each separate act, even if the acts were committed in close temporal proximity." *Barnes v. State*, 165 S.W.3d 75, 88 (Tex. App.—Austin 2005, no pet.) (citing *Vick v. State*, 991 S.W.2d 830, 833 (Tex. Crim. App. 1999); *Vernon v. State*, 841 S.W.2d 407, 410 (Tex. Crim. App. 1992)). As stated above, in this case, T.S. described several separate acts of sexual abuse, occurring at different locations, including, among others, an incident wherein Stone put his hand in her vagina when they lived at the residence by the old high school, another incident wherein Stone put his penis in her vagina when they lived at the residence on Avenue A, and a third incident wherein T.S. tasted Stone's semen. T.S. also testified that Stone tried to put his "thingy" in her private "a lot" in A.P.'s bedroom and in the living room. Based on the evidence, the jury was free to infer that these incidences were not committed all at once, as Stone argues. The evidence supports a finding of three separate events prompting three separate convictions; therefore, we conclude that the indecency by contact offense proven is not included within the aggravated sexual assault offense proven, and the indecency by exposure offense proven is not included within the indecency by contact offense proven. *See id*.; *Hutchins v. State*, 992 S.W.2d 629, 633 (Tex. App.—Austin 1999, pet. ref'd untimely filed) ("Although the two acts were committed in close temporal proximity, appellant's touching of L.M.'s genitals with his

---

[9] Stone's arguments are premised on a theory that all three acts occurred on the same day; however, T.S. described the events occurring at different residences and on "a lot" of separate occasions. Therefore, the jury was free to believe that the three acts did not occur on the same day as Stone asserts.

fingers was a separate and distinct act from his penetration of her female sexual organ with his penis.  Because appellant has not shown that his conviction for indecency with a child by contact was based on the same conduct underlying his conviction for aggravated sexual assault of a child, his contention that these convictions constitute multiple punishments for the same offense is without merit.").  We overrule Stone's second, third, and fourth issues.

## IV.  MODIFICATION

In cause number 13-10-00428-CR, the trial court's judgment mistakenly states that Stone was convicted under section 22.02 of the penal code.  *See* TEX. PENAL CODE ANN. § 22.02 (West Supp. 2010) (setting out the elements of aggravated assault).  However, Stone was convicted of aggravated sexual of assault of child pursuant to section 22.021 of the penal code.  *See id.* § 22.021(a)(1)(B)(i).  The Texas Rules of Appellate Procedure give this Court authority to modify judgments sua sponte to correct typographical errors and make the record speak the truth.  TEX. R. APP. P. 43.2; *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.); *Gray v. State*, 628 S.W.2d 228, 233 (Tex. App.—Corpus Christi 1982, pet. ref'd).  Therefore, we hereby modify the judgment to indicate that the statute under which appellant was convicted is 22.021 of the penal code.  *See* TEX. CODE CRIM. PROC. ANN. § 22.021(a)(1)(B)(i); *see also* TEX. R. APP. P. 43.2; *French*, 830 S.W.2d at 609; *Rhoten*, 299 S.W.3d at 356; *Gray*, 628 S.W.2d at 233.

## V.  CONCLUSION

21

We affirm the trial court's judgment in appellate cause number 13-10-00427-CR, and we modify the trial court's judgment in appellate cause number 13-10-00428-CR and affirm as modified.[10]

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
31st day of August, 2011.

---

[10] We also dismiss as moot appellant's motion to dismiss court appointed counsel and appoint new counsel carried with the case on December 9, 2010, because appellant has received the relief he requested in that motion.